Wright v. Beck, Ms. Barvere. Good morning, and may it please the Court, Anna Barvere, counsel for Appellant Wayne Wright. I'd like to reserve three minutes for rebuttal, if I may. The Constitution prevents the government from finally depriving a person of their property without due process of law. It also prevents the government from seizing property without a reasonable justification. Yet the District Court's order and summary judgment before you today authorized the LAPD to do just that. Fortunately, the District Court's mistakes are banal. It simply misunderstood some key legal authorities and failed to recognize that there were genuine factual disputes making summary judgment inappropriate. All right, so this case came up here once before, right? That's correct. And so a three-judge panel sent it back and said something. Apparently the judge had granted summary judgment saying your client had no possessory interest, and the three-judge panel said, no, that's not right. There's a disputed on that go-back. I'm having a hard time. I've spent a lot of time on this. I'm having a hard time putting my arms around in the record. Now, you're not challenging the original search warrant that took 400-plus weapons. That's not your Fourth Amendment violation, correct? That's correct, Your Honor. The Fourth Amendment violation that is being alleged in this case has to do with the final deprivation of the property, either that was when the city no longer had a reasonable justification to continue the seizure, or when it was finally disposed of via the 2013 order by the LA Superior Court. So how many of the guns are you claiming that against? It's not clear to me. I keep going through here, and I'm not sure how they were able to seize all of those guns in the first place. That being said, because he wasn't a prohibited person, but I recognize that he'd been arrested for a sting, and so what did the search warrant say they could look for? There were actually a number of search warrants that had been issued in the course of his case. The first warrant got all sorts of firearm property, as well as non-firearm property and cash that was at Mr. Wright's residence. Then there was another warrant that went to his storage unit, also in Ventura, and that also uncovered a number of firearms property there. Also, I believe, I mean, it would have allowed any other types of firearm property, things like a firearm stand, advertisements for gun shows, things like that. And then eventually, there were, I believe, two more warrants going to, what are they called? The pawn shops, or a dealer that had help that was holding onto a few of Mr. Wright's firearms, and those were picked up by warrant also. Okay, so then he's not a prohibited person at the time that he's arrested, but then as part of his plea agreement, he agrees for 36 months he will not possess weapons. So then he gets convicted of a misdemeanor, so he's not a prohibited person now. Of those firearms, I know it's very easy for ATF to run all of the, they can run all of them, they can tell you what happened with all of those firearms. How many of the firearms are you not or I'm just not clear to me. How many are you saying that he's entitled to have? I'm not really sure. There is a document in the record that shows exactly which firearms were not returned. It would be all of the firearms that were subject to and destroyed under the 2013 order. Excuse me. There was like, I thought there was a few of those at least that he, one of us like an assault weapon under California law and maybe a suppressor silencer. So there's a few that he didn't want back. I think that's what Jeff Callahan maybe asked. That's correct. The number of them were not included in the record as firearms that he was seeking. But it was in the 300s, the firearms that were not returned and also were not contraband. Okay. So, but that he's not seeking, he wasn't seeking stolen weapons. He's not seeking weapons that have obliterated serial numbers because that's against the law too, or if they're otherwise contraband. But you don't know how many that is? Off the top of my head, I apologize, Your Honor. I don't have that document with me. But again, it was in the 300s. It's in, it's, it was in a, it's an exhibit to the MSJ that somehow there was a lot of work that was done on some 90 something firearms or something along those lines. Why wasn't work being done on the other ones? Why wasn't he trying to get the other ones back during that period of time? He was trying to get all of the firearms back, Your Honor. The fact of the matter is that the way that California law is and has been over history is that for the most part, restoration of firearms is not necessary. Mr. Wright had been- But his plea agreement said he had to present certain things, evidence. So are you claiming that some of their requests were things that people don't have to produce under the law? That's not what I'm saying, Your Honor. What I'm saying is Mr. Wright provided a sworn declaration that covered every single one of the firearms he was seeking to get back, including ones that had original receipts for. But in the, for the history, again, Mr. Wright amassed his firearm collection over decades, for many, many, over many, many years. He didn't have original receipts for a lot of those things. And so instead, he provided a sworn declaration. Under LAPD policy, the defendants were responsible for articulating, creating articulable probable cause before they were permitted to throw away that declaration. Did they ever do that? Did they ever respond to his declaration? They never final, I mean, not finally. And in deposition, it became clear the defendants admitted that, at least that they rejected his Wright's sworn declaration before, without forming the required articulable- What was their reason, what was their reason for, so as I understand it, there's like three buckets here, putting aside the few that he didn't want back. There's the ones that like were already registered under whatever that's called under California. And that was like either 20 or 40 or something like that. And then the rest of the 90 were ones that he had receipts for. So that was, that's another bucket, receipts, but not registered. And my understanding is like some of the guns didn't have, the law didn't require them to all be registered. So, and then the vast majority of the remaining ones, he didn't have a receipt or, and that's the ones that ended up getting destroyed. He didn't have a receipt, nor did he have, were they registered? But he provided a declaration for those, right? That's right, a sworn declaration. And so what was the reason that the LAPD deputies or whoever it was that was deposed gave for why they weren't willing to give those back? I recall reading that, but what were the reasons they gave? They gave a number of reasons throughout the, through the course of discovery and deposition. An important one in violation of LAPD's policy was they admittedly based many ownership decisions on the fact that those guns were not registered to Mr. Wright. And as we explained, LAPD policy says, and I quote, a lack of registration does not constitute- Can you give us record sites for this? Can you give us record sites for these, where you're filming? The citation to the excerpts of record would be found on opening brief pages 40 to 41. Okay. If I can do a more specific. With regard to, with regard to failing to give... Sorry. The brief there, that's fine. I don't want to take too much of your time. Yeah, it's all on pages 40 to 41 of the opening brief. We'll have sites to the excerpts of record. Again, additionally, they rejected, I mean, excuse me. They believed, they admitted that they believed Mr. Wright had engaged in past illegal transfers, even though that is not a grounds under LAPD policy for creating this articulable probable cause. And because, and even though they had no, really not met a burden of proof that would allow them to then withhold the firearms from him, if they even thought that that was true. They also admitted that they gave no effect to his prior ownership. The fact that they had seized those firearms direct, and especially the ones that were seized directly from his possession. This is required under state law presumptions of ownership, including evidence code 637, which was expressly incorporated into LAPD policy when it was adopted by the LA City Council. They admittedly ignored many of Mr. Wright's receipts and other proofs of ownership, and admittedly ignored California Department of Justice's notices about the unreliability of AFS and registration records regarding firearms. So, I mean, there was a huge number of things that show that what the, that the investigation of the city when creating Mr. Wright's proof of ownership was far from reasonable. And, and so the district- If you go back on the Fourth Amendment part, I understand your due process argument over the ex-party hearing. But under the Fourth Amendment, if you were to go back and have a trial on this, what would be the triable, what are the disputed facts here? What's the, they, that they, that they seized weapons based on saying that because you can't provide proof of register, because they weren't registered to you, you, and even though that wasn't required under the law at that time, and that, that, that, is that the disputed fact there? That they were requiring him to produce something that wasn't required under the law to show that they were his firearms? Thank you, Your Honor. I think the ultimate question that we're getting, that we'd have to get at under the Fourth Amendment is, excuse me, whether or not the city acted reasonably in refusing to return the firearms. And that's not the district court, the question that the district court answered was, well, did they act reasonably when they, they got, they disposed of the firearms because they had a 2013 order? The question comes back to really before that, all of the steps that led to it, did the city act reasonably in application, in its application of LAPD's policy and incorporated state laws when reviewing Mr. Wright's proof of ownership? So counsel, counsel, what do we do about Jessup? I mean, it seems Jessup says kind of surprisingly to me that the police can just steal your stuff when they're, and it's not a Fourth Amendment violation, but it is the law in the Ninth Circuit, unless the U.S. Supreme Court overturns it. So what do we do about that? I mean, if the police can steal your stuff, then why can't they keep your stuff for 10 years and burn it? Jessup's an interesting case, setting a sign that it was likely wrongly decided. The case, the case law that was binding in 2013 when this order was given, which is the relevant time period, Jacobson and Levon in the Ninth Circuit is clear that there's a different seizure at issue when you're talking about the government continuing a seizure beyond the initial seizure and destroying the property without justification. So Jessup perhaps took a little- I get that, but it's a little odd. I mean, it seems a little odd to me because then that means that when the police are like grabbing your stuff to seize it in the first instance, if they pocket some of it, that's not a Fourth Amendment violation. But if the guy that works in the, I don't watch enough detective movies or whatever, but the locker room or whatever, if he pilfers it- Property. It isn't in the first instance, but it is in the second instance. That's kind of weird. It's a very weird outcome, but I think even if the court isn't going to overturn Jessup, it's still distinguishable here for at least two reasons. Jessup at least partly relied on the availability of state court post deprivation remedies that simply were not available to Mr. Wright. A fact that was made very clear when Mr. Wright tried to get the California Court of Appeal throwing out his state court torts on the grounds that anti-SLAPP and litigation privilege apparently immunized the city's conduct here. So taken together, Jessup, the district court's order here and the decision in Wright's state court action provide the government here with near total immunity for the unjustified permanent seizure of property no matter what illegal or improper acts it might take. But there's a second reason this case is distinguishable from Jessup, and the court can find differently. In that case, the ultimate seizure, the alleged theft that happened there took place while the initial probable cause for that seizure was still in existence. There was no ongoing obligation of the government to return the property in that case. Here, however, probable cause, at least this is the Fourth Amendment argument we're making, is that probable cause no longer existed once Wright submitted what he thought was policy-compliant proof of ownership, because now the burden twisted to the city to create a new reasonable justification for the seizure, which it no longer had if, as the record shows and the district court ignored, they had not engaged in a reasonable investigation of his proof of ownership. Okay, counsel, your time is almost up. So why don't you save the balance, and I'll give you another minute for rebuttal. But let's hear from the city. Thank you, Your Honor. Mr. Sherb. Thank you, Your Honor. Good morning, Your Honors. Matthew Sherb on behalf of the defendants, City of Los Angeles individuals and official capacity defendants. I wanted to start where Judge Callahan started just to give some context for the reasons the officers treated the declaration the way they did. So I wanted to provide the record site, 9 ER 1861, starting at line 17 of the deposition transcript. And you have an officer testifying about why the declarations weren't sufficient. He's recounting what he had told the judge in the 2011 property hearing, so that, you know, I argued that he had not met the burden of proof that his affidavit was not good due to the fact that it did not include anything that I could verify. It had nothing to do with who bought the guns from or receipt a person or, I'm sorry, it didn't include a receipt, a purchaser, who he purchased the gun from or who he sold the gun to. It didn't include anything I could verify. And again, at this point, Detective Edwards and I had run AFS, E-Trace, we had done, we had looked at Dross, dealer record of sales, and 4473s on his list of firearms. It could only come up with 26 firearms. And that's why- But a lot of these things are not, they aren't subject to what D-R-O-S is or whatever you call them. So, I mean, there is, I mean, anyone that, I would be really, I'm just wondering why the government was slow walking this the whole way, because ATF could run all of this for you. You know what laws applies at certain times. And then even when you're going to court all the time, they're saying, oh, we're working our way through these 93, we need more time or something like that. And finally, the court got disgusted and just said, why don't you guys just meet and confer and get all of this done? So, I mean, it seems like, okay, admittedly, it seems like the government thought this guy was a pretty bad guy, even though he was a former police officer, that he has all these guns. But then the reality of it is that they end up with a plea bargain of a misdemeanor. So he's not, after the 36 months of his probation are over, he can have firearms. But it seems like the government's been slow walking it the whole way and doesn't want to give anything back to him. Well, I'd like to address the timeline. And I think it's important, again, that there were three years between 2006 and 2009, when he could not, when Wayne Wright could not possess firearms under the plea agreement. And also to stress that, overarching all of this is the idea that under Perkins, Mr. Wright was well aware- Council, what does that have to do with anything, though? Because I mean, I've read the record on that. At that point, he was saying, give it to an FFL. So I don't see how that has anything. I mean, it wasn't like he was agreeing that they could, that he wouldn't take personal possession. And then he says, okay, my three years is up, give them to me now. So I don't think that's wrong. And that's fine, Your Honor. But what I think is important is that under the plea agreement, he had to submit proof of ownership to the Los Angeles Police Department. And the record is undisputed that no evidence was produced until 2010. The property return motions that took place in 2006 that was denied, it was because that there was no evidence presented whatsoever on the firearm property. And then when you get to 2010, the officers are looking at the copies of the 94 receipts and trying to do what they can with them. They asked to get originals. The originals couldn't be provided. There was a dispute about whether they could be looked at at an office or not. But in any event, the originals didn't come until after the 2011 property hearing, at which point the first evidence that really gets submitted to a court for resolution of this in 2011 in September is the reply declaration in that proceeding of Wayne Wright. And that's the one that just proclaims a property interest in the firearms and then copies of the 94 receipts. And then it's after that hearing when the court... Did you run all of these to the 400 plus weapons? Did you run them through ATF from the start? That's what agencies do. ATF can run all of those with the serial numbers. They can tell you everything. My understanding is that Detectives Edwards and Tompkins ran all of those firearms, did research on all of them and provided their declarations in response to the property return motion in 2006 and the property return motion in 2011. I think that's where some of the numbers come about some of them being stolen or having mismatched serial numbers or weren't all serial numbers and all of that. And those declarations are in the record. I would have to go and look at the brief to provide the exact sites for those. But I think both parties referenced them. Mr. Sherb, so when we get to the destruction, why didn't the LAPD give him notice that they were going to go in and ask for an order to destroy the guns? I mean, ultimately, why we didn't give notice, I don't know. I think the officers believed that the process had truly run its course. And I think that's why Section 34,000 is implicated here of the Penal Code, because you have a situation where the last evidence of ownership was produced in 2011, November, and all communications with Wayne Rights Council end in January of 2013. And so by the end of that year in December, nearly a year had gone by- But it's Detective Edwards, right? Isn't it Detective Edwards that seeks it? I believe that's right, Your Honor. And Detective Edwards is one of the detectives that was working on the return of these firearms, right? Yes. So Detective Edwards would have had to then that after the last court hearing, the judge sent you guys back to figure it out. Well, I will grant that- I mean, it certainly would be just- It certainly would appear to be on notice of that. I would grant for purposes of summary judgment that there is some dispute brewing about what happened in 2011. But I want to point out, both at the site I gave before at 9 ER 1861, where Edwards himself testifies at the conclusion of the hearing, quote, the judge ruled in our favor. And I would also point out the site to the record at 7 ER 1341, where counsel for Wayne Wright testifies at his deposition that he believed that as to the firearms that were not returned, that there was a denial as to those firearms by the judge. And I'd also point out the Court of Appeal decision from the California State Court of Appeal, which at Lexis page star 36, has said that 35, initially, first, I'm sorry, we can infer the Venturia Court rejected Wright's argument and concluded the evidence did not compel the return of firearms listed. And then goes on to say that Wright had the, amongst the several remedies he could have pursued, he could have sought a writ relief from the 2011 order. So I think it's really important, both from a due process perspective and also from the Fourth Amendment perspective- Okay, if Detective Edwards goes into a judge, X party, and then signs the affidavit that he, I was a Superior Court judge, so I had people come into me, X party. I think Judge Pius was too, so he knows that. I would have had no reason with that declaration, I would have signed it, and that would have been the end of it. But what I'm hearing and looking back at the record, that declaration was not accurate about what they had been told previously. Now, whether Detective Edwards misrepresented it or he misunderstood it, whatever, but it wasn't accurate. And I'm assuming probably that that was also under someone in the city attorney's office reviewing that, who would have been in court at that particular time. So I don't know how LA, I don't know how the sheriff or the city attorney's office can honestly say that they didn't think that he had any interest left in those guns. And then to go in X party, that doesn't look very good. I appreciate that, Your Honor. I do think what we know is that on the application that was filed in 2005-7-7, what Detective Edwards says is the evidence was seized in 2004. Items that have been identified as belonging to the defendant through receipts, DROS, and E-trace have been returned. No evidence of ownership by the defendant has been received in regard to the last- That's all well and good, but I still want to know why they didn't give notice. Why didn't they just give him notice? We're going to go in and we're going to get this order from the Superior Court to destroy these guns. If you want to object to it, you can. Why didn't they do that? I don't understand. And let me ask you this. Is it your position that the Constitution doesn't require them to give this kind of notice? I mean, it's the city's position that the Constitution, because of the Perkins decision, which says- Perkins is different. I agree that Perkins only dealt with the retention of property and did not involve the destruction of property, but there are two district court cases that have come out since then. The Wise decision involving the auctioning of property and the Kaylor decision, C-A-Y-L-O-R, that we cite in the briefs that involves the transfer of property to a third-party non-involved law enforcement agency. In both of those cases, Wise directly citing Perkins, Kaylor just referring to California's return of property process, say that Perkins is sufficient, that if you have notice, and it's sort of implicit in Perkins, is if you have a property return procedure available to you and, in fact, if you take advantage of it, implicit in that is that at some point, you're not going to get your property back if the property return procedure goes against you. What you're saying is, okay, there was another potential avenue he could have sought, but you didn't tell him that you were going to destroy the guns. There's two things there. One is that under Perkins, the initial notice would have been the Penal Code Section 34,000 and 18275 provide the same kind of notice that Section 1536 does about property return proceedings. They provide notice that the firearms are subject to destruction and forfeiture after a period of time, after the six months of forfeiture. There's no question about that, but it's giving him the notice and the opportunity to be heard. Say, hey, Judge, there is a dispute over whether or not I have ownership of these guns, and I should have an opportunity to show you that I have an interest in these guns, and they shouldn't be destroyed. And as Judge Callahan said, when they presented that affidavit to the Superior Court judge, routinely, they were going to sign it. He had no notice. I don't understand how you can take the position that he was not entitled to some notice. I think I've made the argument that I can make under Perkins and the statutes that are out there that provide the notice and expand Perkins beyond its reach. But what I do think is important here is that there's no case that clearly establishes the right to that additional notice here. If the court's going to conclude that Perkins doesn't go as far as the city wants it to go, given the statutory framework and the like, I don't think the law is clearly established. Perkins definitely does not hold that some further additional notice pre-destruction is required. And in light of Wise and Kalor, it doesn't seem fair to hold LAPD officers responsible for having guessed a different outcome in this case, especially in light of the Superior Court decision here that Wainwright's attorneys procured addressing the Perkins issue in this context and saying that LA Superior Court policy was compliant with due process under Perkins and that notice was not ruling if the court here is going to say that Perkins was wrongly decided. But I think as a matter of law, it should entitle the officers here at least to qualified immunity. And we've also made the additional argument that that decision should collaterally estop Wright, who is clearly in privity with the CRPA and was the entire basis of that proceeding, but that proceeding should not allow the re-litigation of the due process question. Well, that really wasn't even a lawsuit. It was a special proceeding, which under California law is entitled to the same preclusive effect as any other court order. They were asking the Superior Court to change its policy. How could that even be a special proceeding? The Superior Court created it as a special proceeding. The issues were briefed. Wright was represented by competent counsel who connected all of the issues in this lawsuit, with the special proceeding. And it was very clear that the court addressed the constitutional question and that Wright and his attorneys didn't appeal. I understand that there isn't an exact case involving privity in that sort of situation, but I think the Tahoe case is very much on point and it should be applied here given the close connection between Wayne Wright and CRPA and his attorneys. But again, at the very least, I think qualified immunity applies here on those grounds and definitely applies on the Fourth Amendment side, given the uncertainty about Jessup and the fact that there's... Well, now what do you think? Maybe you want to talk about Jessup. It's incredible to me that officers can go and steal. I think if you ask kindergarteners about this, they would come to the opposite result. It's incredible to me that the... I really find it hard to let that lie. And I'm not... If you read a lot of things that I've written on qualified immunity, I think there are a lot of decisions that officers make that are mistakes, but it's not clearly established or we can't... There's a lot of... There's certainly... There's a basis for that. But stealing is something that if you ask kindergarteners, they know that that's wrong. I don't want to defend Jessup on its facts. What I want to say is that at the very least, there's no accusation of theft here in the same sense. We're talking about officers going into court and obtaining an order after years and years of a process and after a year or so of having heard nothing from Wayne Wright. What's important about Jessup is that... And it doesn't resolve the constitutional question at all. It doesn't say it's not unlawful for their... It doesn't say the Fourth Amendment doesn't address theft. What it says is that the law hasn't been clearly established, even if you looked at Brewster versus Beck and the other cases in the Ninth Circuit, which hadn't been adopted by the time that we had the actions in question here. I mean, what's important about Jessup is that it cites all of these other circuit court cases that make it seemingly as though the Fourth Amendment doesn't apply to post-seizure conduct. And you have to know from the First Circuit involving the disposal of all of these other cases, Jacobson, Levon, they deal with single destructions all at once. They're not like the situation we have here, which is evaluating a situation where there's a warrant-authorized seizure that's complete and then conduct many months or years down the road. And I think what's clear when you look at Jessup is how this is just, at the very least, a very unclear area of the law and that the Fourth Amendment's applicability here is a big question mark at best. Well, the other claim is a due process claim. Correct. Notice. Notice is fundamental to due process. Any reasonable person would understand that notice is fundamental. I do not understand, given the long relationship here taking place for a number of years, that it reached the point where the officers decided we're going to destroy these guns. They didn't tell them that that's what they were going to do. We're going to go in and apply for an order. And the response that the city has is that given Perkins, the district court cases that I've cited, that law wasn't clearly established. The existence of that statute, 34,000, which clearly authorized the destruction of guns that held after six months of a hearing or were abandoned based on the lack of any contact, even if the officers were wrong in applying that statute, there'd be no violation. And I know we're running low on time, but that's just not... I mean, starting in the exertion record, 1590, so 1590, they were asked why they didn't just accept the declaration, because that is something that's referred to in the policy. And they basically said, because we thought this guy did all kinds of bad things. Nothing he'd been convicted of, but that we thought he'd done all kinds of bad things. And that's what they said. And so it's not like a whole bunch of time had gone on and the police... The reality is, I guess my final question is, is it even plausible that the officers thought that the remaining 300-plus guns, that he didn't own some of those cars that were all old cars, so I don't have registrations, but my grandpa bought them from somebody back before you needed registrations, and you just destroyed them? Did they actually... I don't think that it's actually plausible that they actually thought he didn't own them. They just didn't think he should have them, so they thought they could get away with destroying them. I don't think there's anything about getting away with here. I think the officers firmly believe that Wayne Wright had not produced the evidence required by the policy. He had produced the 94 original receipts, but otherwise... So where did they think he got the 300 guns? Did they think he stole them or something? I don't know, but what I do know is that the LAPD had a policy that made it clear that a declaration was insufficient, and they had a declaration that, as I read from at the very beginning of the argument, they thought had serious problems. Wait, wait, wait. You said a policy that the declaration was insufficient? That's exactly the opposite of what their policy said, and the testimony was, when they're asked about this, starting on 1590, asked about why they didn't accept the declaration. They basically say, it takes pages, but basically to paraphrase it is, well, if we think you're a particularly bad person and you may have stolen guns or possessed firearms that weren't registered or basic background, then we're not going to accept a declaration. Why didn't they let a court decide that? They just decided and then burned all his guns. My understanding is that... So if you'd allow me to very briefly address both parts of that question, I'd appreciate it. The last part being why did they do this is they had a nearly a year, over a year of not getting new evidence and over six months, close to a year of having no contact, trying to justify having Wright try and believing that this process had come to an end. There was the property return proceeding in 2011. There was a negotiation over the 94 receipts, 80 of those guns. Isn't it true that they had spent like, I mean, he would, as I recall seeing in the record, a long time ago by, I don't know, like a year or something, and he would reach out and they'd say, we're still working on it. We're still working on it. So I don't think it's quite, I mean, again, really a jury probably just needs to decide this, whether or not it's plausible. The fact that they were just thought, well, it's all done when previously he'd reached out to him every year saying, what's going on? We need more time. Well, your honor, it's undisputed that the contact entirely ceased in 2013. There was some contact in 2012 about how to get the guns back that had already been released. But the back and forth about we need more time precedes all of that and is not part of what caused the officers to have moved at the end of this process to have the guns destroyed. And then very briefly, I just want to just get to the policy here. It says that it's, the department has to accept reasonable proof of ownership. Registration must be accepted, but registration is not necessary. It says, unless there's articulable probable cause to disbelieve a sworn declaration, a sales receipt or other proof of ownership shall constitute proof of ownership. So you need a declaration plus. And the court of appeal is very clear about that. In citing in footnote 25 of its decision, your right side had no authority that a declaration alone constitutes proof of ownership under the policy. And that's the way it has been. I understand my time is greatly extended. Thank you. Thank you. We appreciate your argument. The other side, Ms. Barvere, you have a few minutes of rebuttal. Thank you. I'd just like to make a few points quickly. First, with regard to whether or not qualified immunity is proper for this 14th Amendment claim is simply absurd. It is a well, well-established right that someone is entitled to notice and an opportunity to be heard at a meaningful time before the final deprivation, not simply under Perkins when the property is seized. With regard to whether or not the declaration itself is sufficient evidence under the LAPD policy, at best, that's really unclear. The way our client read it, the way we read it, is clear that a sworn declaration would be enough as long as there isn't articulable probable cause under the LAPD policy to believe it. At the very best, it's other proof of ownership. A sworn declaration by the property claimant is proof of ownership unless you can tell me why you don't believe it. Additionally, the city here is kind of playing fast and goose with what the facts are with regard to that declaration, suggesting all it says is, here's what it is. No, many, many dozens and hundreds of those firearms within that declaration explain exactly who Mr. Wright purchased those firearms from. If you'd listen to this man and if a jury heard this man, which they should get the MSJ, they could know that he could sit there and rattle off who he bought these firearms from, where he got them, when he got them, what he was eating for lunch that day. Mr. Wright has that information and they simply threw it away because they thought he was a bad guy. This cannot stand. 3,400 penal code kept popping up suggesting that Mr. Wright abandoned it. It was really, it's very clear, undisputed that those firearms were never made available for his return. Under that penal code section. So it's just simply inapplicable. But even if it were, again, the question of whether or not he abandoned it is really clear in our opinion on the record that he did not abandon them. But at the very least, this is a question for a jury. OK. Thank you, counsel. Thank you. We appreciate your arguments this morning and also your willingness to participate by video. Thank you. That ends our session for today. This court for this session stands adjourned.
judges: Paez, Callahan, Vandyke